**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aaron Smith, | No. CV-21-01012-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| City of Mesa, et al., | |
| Defendant. | |

This case arises out of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq*. Plaintiff Aaron Smith ("Plaintiff") alleges Defendant City of Mesa (the "City") religiously discriminated and retaliated against him during his employment. Plaintiff has filed a Motion for Summary Judgment (Doc. 35)[1] on the following claims: (1) the City failed to accommodate Plaintiff's religious beliefs; (2) the City subjected Plaintiff to disparate treatment and constructive discharge based on his religion; and (3) the City retaliated against him after he requested a religious accommodation. The City has filed a cross Motion for Summary Judgment (Doc. 36)[2] on all three claims. The Court must decide whether a triable issue of fact remains for the jury. For the following reasons, the Court denies Plaintiff summary judgment and grants the City summary judgment, in part.

## I.   Background

---

[1] The matter is fully briefed. The City filed a Response (Doc. 37) and Plaintiff filed a Reply (Doc. 39).

[2] The matter is fully briefed. Plaintiff filed a Response (Doc. 40) and the City filed a Reply (Doc. 41).

### A.    Plaintiff's Religion

Plaintiff has been a member of the Jehovah's Witness religious faith since he was 14 years old and is currently an Elder or "overseer" in his congregation.  (Doc. 1 at ¶ 12). He worked at the Jehovah's Witness Organization World Headquarters from 2000–2008. (*Id.*)  He continued in full time ministry in Louisiana until 2014, when he moved to Arizona to help start a new congregation.  (*Id.*)

Every 3 years, the Jehovah's Witness Organization holds a "School for Congregation Elders" ministry training event (the "Elders Training") in New York.  (Doc. 1 at ¶ 13).  Plaintiff had attended the Elders Training before and believed it was mandatory. (Doc. 36-2 at 58).  The 2020 Elders Training was held from March 2–5.  (Doc. 36-2 at 58).

### B.    Plaintiff's Employment with the City

The City hired Plaintiff as a permit technician in March 2019.  (Doc. 1 at ¶ 11).  His direct supervisor was Heather Basford ("Ms. Basford").  (Docs. 1 at ¶ 15; 36-4 at 3).  Under the City's Personnel Rules (the "City Rules") (Doc. 35-3 at 27–88), Plaintiff was placed on an "Initial Regular Employment Probation" at the start of his employment, which is a "stipulated time period beginning at hire or rehire to the City that a full-time employee must successfully complete[.]"  (Doc. 35-3 at 33).  The probationary period is for an employee to "demonstrate ability to perform the duties of the job in a satisfactory manner." (*Id*. at 34).

The City Rules also provided procedures for requesting leave.  As to requests for paid and unpaid time off, the Rules provided that "absence from work is subject to supervisory approval" and "request[s] must be submitted and must be approved by the employee's supervisor."  (*Id*. at 53). Further, "[a]n employee who is absent without supervisory approval (unpaid time off), . . . has an unexcused absence and is subject to the disciplinary action listed below.  For the third (3rd) instance of unexcused absence within twelve (12) months of the second (2nd) unexcused absence, the employee shall receive, at a minimum, a suspension of one (1) day, or discipline up to and including termination[.]" (*Id*.)

1       From the start of his employment through January 2020, Plaintiff took a total of 212
2   hours of leave: 24 hours of discretionary time; 20.75 hours of voluntary unpaid leave; 86
3   hours of scheduled and unscheduled sick time; and 81.25 scheduled and unscheduled
4   vacation time.  (Doc. 36-3 at 33) (Plaintiff's time log).

5       On January 7, 2020, Ms. Basford noted instances where Plaintiff did not follow
6   procedures for absences and sick time.  (Doc. 35-4 at 2).  She cautioned him via email that
7   "[f]ailure to report within the specified time period may result in the employee being
8   docked pay and subjected to disciplinary action, up to and including termination."  (*Id*.)

9       On February 3, 2020, Ms. Basford recommended to the human-resources
10  department that Plaintiff be terminated due to deficiencies in his performance. (Doc. 36-4
11  at 14).  Ms. Basford documented seven incidents spanning from May 2019–January 2020.
12  (*Id*. at 14–15).  Instead of terminating Plaintiff, the human-resources department decide to
13  extend Plaintiff's Initial Regular Employment Probation and put him on a corrective action
14  plan to "afford[] him the opportunity to correct the issues."  (*Id*. at 9).  Ms. Basford worked
15  with the human-resources department to draft Plaintiff's corrective action plan.  (*Id*.)

16      On or around February 10, 2020, Plaintiff met with Ms. Basford to request time off
17  from March 2–5 so that he could attend the 2020 Elders Training.  (Docs. 1 ¶ 15; 36-4 at
18  5).  Plaintiff needed 4 days off but only had 2.5 days of paid accrued vacation time
19  available.  (Doc. 1 ¶ 16).  Thus, Plaintiff requested to use 1.5 days of voluntary unpaid
20  leave to cover the remaining days.  (*Id*.)  Ms. Basford granted Plaintiff's request for 2.5
21  days of paid accrued vacation time for March 2–3, but denied his request for 1.5 days of
22  voluntary unpaid leave. (Docs. 1 ¶ 17; 36-4 at 5).

23      Ms. Basford spoke to the human-resources department about her decision to deny
24  Plaintiff's request for voluntary unpaid leave.  (Doc. 36-4 at 6).  They discussed whether it
25  would be possible for Plaintiff to work an alternative schedule so he could attend the Elders
26  Training.  (*Id*.)  They ultimately concluded there was no feasible, alternative.  (*Id*.)

27      On February 18, 2020, Ms. Basford sent Plaintiff a "Memo of Understanding"
28  notifying him that his Initial Regular Employment Probation would be extended for another

year.  (Doc. 35-4 at 12–14).  Therein, Ms. Bradford detailed instances spanning from May 2019–January 2020 where Plaintiff's performance was deficient.  (*Id*. at 12–13).  She provided him with the corrective action plan that she and the human-resources department drafted to help him "develop[] the knowledge required to work independently as a Permit Technician."  (*Id*. at 13–14).  She notified him that "failure to correct these actions as stated can result in termination with [his] employment with the City[.]"  (*Id*. at 14).

On February 24, 2020, Plaintiff emailed Christine Zielonka ("Ms. Zielonka"), who is Ms. Basford's supervisor, to ask if she could approve his request for 1.5 days of unpaid leave.  (Doc. 35-4 at 9).  He explained that according to the department calendar, no staff would be out on March 4 and the only one employee would be out on March 5.  (*Id*.)  Ms. Zielonka explained approval of voluntary unpaid leave time "is in the sole discretion" of his supervisor and she would not overturn Ms. Basford's decision.  (Docs. 35-4 at 9;   36-4 at 6).  At the end of the workday, Plaintiff gave Ms. Basford his resignation letter effective March 3, 2020.  (Doc. 35-4 at 16; 36-4 at 6).  Plaintiff explained "[he] must resign in order to attend [his] religious class."  (Doc. 35-4 at 16).

On February 25, 2020, Ms. Basford "ran reports to get a handle on [Plaintiff's] workload since [she] noticed that work was not being completed" and Plaintiff only completed 6 tasks the previous day.  (Doc. 36-4 at 7).  After conferring with Ms. Zielonka, Ms. Basford moved Plaintiff's workspace to the call center "so that [she] could keep an eye on his activities."  (Docs. 36-4 at 8; 35-4 at 35).  She then negotiated a number of tasks Plaintiff should complete that day, first proposing 50 tasks and then settling at 30 tasks.  (Doc. 36-4 at 8; 35-4 at 32).  Ms. Basford also placed a "Do Not Disturb" sign at Plaintiff's cubicle. (Doc. 36-4 at 8).

That same day, Plaintiff submitted an internal "Workplace Discrimination/ Harassment Complaint Form" with the City's human-resources department that detailed Ms. Basford and Ms. Zielonka's denial of his request for time off.  (Doc. 35-4 at 24–26).  He claimed:

I believe that I should have been offered a "reasonable accommodation" due

1
2
3
4

> to this being a required religious event.  Heather Bashford  [sic] is my direct
> supervisor, she initially denied the request.  I elevated it to Christine Zielonka
> and she sided with Heather on the issue.  This has left me no choice but to
> resign from my position . . . in order to attend this important event. . . . I
> believe this type of discrimination is an ongoing issue with the City[.]

5       (*Id*. at 24).

6           **C.    Plaintiff's Complaint**

7               In his Complaint (Doc. 1), Plaintiff alleges the following three claims against the

8       City under Title VII 42 U.S.C. § 2000(e)-2: (1) failure to accommodate Plaintiff's religious

9       beliefs; (2) disparate treatment and constructive discharge based upon Plaintiff's religion;

10      and (3) retaliation for Plaintiff's request for a religious accommodation.(*Id*. at ¶¶ 34–70).

11      Plaintiff and the City each move for summary judgment on all three claims.

12      **II.    Legal Standard**

13              A court will grant summary judgment if the movant shows there is no genuine

14      dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R.

15      Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A factual dispute is

16      genuine when a reasonable jury could return a verdict for the nonmoving party.  *Anderson*

17      *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court does not weigh evidence to

18      discern the truth of the matter; it only determines whether there is a genuine issue for trial.

19      *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994).  A fact is

20      material when identified as such by substantive law.  *Anderson*, 477 U.S. at 248.  Only

21      facts that might affect the outcome of a suit under the governing law can preclude an entry

22      of summary judgment.  *Id*.

23              The moving party bears the initial burden of identifying portions of the record,

24      including pleadings, depositions, answers to interrogatories, admissions, and affidavits,

25      that show there is no genuine factual dispute.  *Celotex*, 477 U.S. at 323.  Once shown, the

26      burden shifts to the non-moving party, which must sufficiently establish the existence of a

27      genuine dispute as to any material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio*

28      *Corp.*, 475 U.S. 574, 585–86 (1986); *see also Celotex Corp.*, 477 U.S. at 324, (holding the

nonmoving party bears the burden of production under Rule 56 to "designate specific facts showing that there is a genuine issue for trial"). The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. But if the non-movant identifies "evidence [that] is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

## III. Discussion

Both parties urge the Court to grant them summary judgment on Plaintiff's Title VII claims for the City's (1) failure to accommodate religious beliefs; (2) disparate treatment and constructive discharge based on religion; and (3) retaliation for a requested religious accommodation. The Court must decide whether a genuine dispute of material facts exists regarding Plaintiff's allegations that the City discriminated and retaliated against him for requesting leave to attend his Elders Training.

Plaintiff first alleges the City failed to provide him with a religious accommodation when it did not approve his request for leave to attend the Elders Training. (Doc. 1 at ¶¶ 38–43). Plaintiff further asserts the City constructively discharged him after he requested a religious accommodation by subjecting him to "discriminatory animus." (*Id.* at ¶¶ 51–56). Last, Plaintiff claims the City retaliated against him by "increased [] scrutiny of [Plaintiff], criticism of [Plaintiff's] work productivity, moving [Plaintiff] to an undesirable work location, significantly increasing [Plaintiff's] workload, changing [Plaintiff's] work assignments to set him up for failure, and humiliating [Plaintiff] by putting up a 'Do Not Disturb' sign at his cubicle." (*Id.* at ¶ 66).

At the outset, the City argues it cannot be held liable under Title VII because Plaintiff did not suffer any adverse employment action and voluntarily resigned. (Doc. 36 at 7–10). It says it did provide Plaintiff with a reasonable accommodation through its "generous time-off policies" and any alternative accommodation would have been

1    unfeasible or result in undue hardship.  (Doc. 36 at 11–14).  Last, the City argues Plaintiff

2    cannot show a causal link between his protective activity and any alleged retaliatory action.

3        The Court will address Plaintiff's claims for religious discrimination and then turn

4    to his retaliation claim.

5        **A.    Plaintiff's Religious Discrimination Claims**

6        Plaintiff's first two Title VII claims are based on allegations that the City religiously

7    discriminated against him.  Title VII's anti-discrimination provision makes it unlawful for

8    an employer to "discriminate against any individual with respect to his compensation,

9    terms, conditions, or privileges of employment, because of such individual's . . .

10   religion[.]" 42 U.S.C. § 2000e-2(a)(1).  Title VII defines "religion" to "includ[e] all aspects

11   of religious observance or practice, as well as belief, unless an employer demonstrates that

12   [it] is unable to reasonably accommodate to an employee's . . . prospective observance or

13   practice without undue hardship on the conduct of the employer's business." 42 U.S.C. §

14   2000e(j).

15       A Title VII religious discrimination claim may be brought under several possible

16   theories, including failure to accommodate religious beliefs or disparate treatment on

17   account of religion.  *Bodett v. Coxcom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004) (citing

18   *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)).  Plaintiff relies on

19   both theories in his Complaint.  (*See* Doc. 1 ¶¶ 34–61).

20       First, Plaintiff's claims the City failed to accommodate his religious beliefs by

21   denying him leave to attend his Elders Training, and this resulted in his constructive

22   discharge.   (Doc. 1 at  ¶¶ 37–43).   Second, Plaintiff alleges that by constructively

23   discharging him, the City treated Plaintiff differently than those employees who were not

24   Jehovah's Witness.  (*Id.* at ¶¶ 51–53).  The Court finds Plaintiff has pled a sufficient

25   religious discrimination claim under a failure to accommodate theory, but has not done so

26   under a disparate treatment theory.

27       **1.    Failure to Accommodate Religious Beliefs**

28       As to Plaintiff's failure to accommodate theory, Title VII makes it unlawful "for an

employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977). The Court's analysis of a religious accommodation claim involves a two-part framework. *See Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006) (applying the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973)). First, an employee bears the burden to establish a *prima facie* case showing he requested and was denied a religious accommodation. *Id.* If the employee proves a *prima facie* case, the burden of proof then shifts to the City to establish that "it initiated good faith efforts to [reasonably] accommodate [an] employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* (quoting *Peterson*, 358 F.3d at 606.

### a.     Plaintiff's *Prima Facie* Case

The first part of the religious accommodation framework requires an employee to establish a *prima facie* case showing: "(1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Id.*

It is undisputed that Plaintiff meets the first and second elements. Plaintiff is a member of the Jehovah's Witness religious faith, and he held a bona fide belief that he was required to attend the Elders Training as part of his religious training. (Doc. 1 at ¶ 12). His attendance at the Elders Training created a conflict with his work schedule and the City's policies for requesting time off. (Doc. 35-6 at 4–5). It is also undisputed that he specifically informed the City his requested time off was so he could attend the Elders Training. (*Id.* ¶¶ 15–17).[3]

At issue is the third element, which requires an employee to show the threat or

---

[3] Moreover, Ms. Basford understood that Plaintiff was resigning to attend the Elders Training. (Doc. 36-5 at 75).

1    actuality of discipline or discharge for failure to meet job requirements. *Peterson*, 358 F.3d

2    at 606 (citing *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993)).  The City argues

3    Plaintiff cannot show he was subject to any adverse employment action as a result of his

4    request for time off.  (Doc. 36 at 7–10).  Plaintiff posits two adverse actions: (1) he was

5    constructively discharged; and (2) he was forced to resign because he believed he would

6    be disciplined if he were to take an unexcused absence to attend the Elders Training.  (Doc.

7    35 at 13, 4–5 ).  The Court will consider each of Plaintiff's arguments.

8                                    **i.      Constructive Discharge**

9          The Court agrees with the City that Plaintiff was not subject to constructive

10   discharge when the City denied his request for leave.  "A constructive discharge occurs

11   when a person quits his job under circumstances in which a reasonable person would feel

12   that the conditions of employment have become intolerable." *Lawson v. Washington*, 296

13   F.3d 799, 805 (9th Cir. 2002) (quoting *Draper v. Coeur Rochester*, 147 F.3d 1104, 1110

14   (9th Cir. 1998) ("[T]he individual has simply had enough; she can't take it anymore.")).

15   The test is an objective one, and "an employee need not demonstrate that his employer

16   intended to force him to resign[.]"  *Id.*  However, summary judgment is appropriate "where

17   the 'decision to resign [was] unreasonable as a matter of law.'"  *Id.* (quoting *King v. AC &*

18   *R Advertising*, 65 F.3d 764, 767 (9th Cir. 1995)) (alterations in original).

19         Here, the only evidence Plaintiff relies on to argue constructive discharge is that the

20   City denied his request for leave.  (Docs. 1 at ¶ 51).  No reasonable person would

21   objectively view one denial of a request for leave as intolerable working conditions.

22   *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987) ("[A] single isolated

23   instance of employment discrimination is insufficient as a matter of law to support a finding

24   of constructive discharge.").  Thus, the record shows Plaintiff was not constructively

25   discharged as a matter of law.  *Lawson*, 296 F.3d at 805.

26                            **ii.      Threat of Discipline or Discharge**

27         Although the Court rejects Plaintiff's constructive discharge argument, Plaintiff has

28   sufficiently shown he faced a threat of discipline should he have attended the Elders

1    Training.  The Ninth Circuit has never "required that [an] employee's penalty for observing

2    his or her faith be so drastic.  The *threat* of [] adverse employment practices[] is a sufficient

3    penalty."  *E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 614 n.5 (9th Cir. 1988).

4          The City cites *Lawson v. Washington* to argue it did not threaten Plaintiff with any

5    adverse employment action.  (Doc. 36 at 9) (citing 296 F.3d 799 (9th Cir. 2002)).  In that

6    case, the Ninth Circuit affirmed the plaintiff failed to make a *prima facie* case for an

7    accommodation claim because he voluntarily quit his job for personal reasons and was not

8    constructively discharged.  296 F.3d at 805.  The employer in *Lawson* did not "mention[]

9    anything about imposing discipline on [the plaintiff] for refusing to comply," and "[t]he

10    mere fact that [an employee m]anual declares that rule violations may result in discipline

11    or termination is not enough" to constitute a threat.  *Id.* The City thus reasons that Plaintiff

12    voluntarily resigned and "simply assumed he would be fired for missing work."  (Doc. 36

13    at 9).  The Court disagrees.

14          Here, Plaintiff would have had to take a third unexcused absence to attend the Elders

15    Training and believed Ms. Basford "would discipline him, suspend him, and possibly

16    terminate him" as a result.  (Docs. 39 at 6; 1 at ¶ 21).  The City Rules indeed provide that

17    an employee who has a third unexcused absence "shall receive, at a minimum, a suspension

18    of one (1) day, or discipline up to and including termination[.]"  (Doc. 35-3 at 53).  The

19    important distinction from *Lawson* is that a month before Plaintiff requested leave, Ms.

20    Basford explicitly cautioned him via email that failure to comply with attendance policies

21    "may result in the [him] being docked pay and subjected to disciplinary action, up to and

22    including termination."  (Doc. 35-4 at 2).  When viewing the record most favorably to

23    Plaintiff, the Court finds Plaintiff reasonably believed he faced a threat being disciplined

24    if he was absent from work to attend the Elders Training.  This threat is sufficient to

25    establish the third element.

26          Although the record shows Plaintiff was not constructively discharged as a matter

27    of law, a reasonable jury could find that Plaintiff faced a threat being disciplined if he was

28    absent from work to attend the Elders Training.  Plaintiff has therefore established a *prima*

1    *facie* case for a religious accommodation claim and the burden of proof shifts to the City.

2    **b.**    **The City's Efforts to Accommodate**

3    The second part of the religious accommodation framework requires an employer

4 to "establish that it initiated good faith efforts to accommodate the employee's religious

5 practices or that it could not reasonably accommodate the employee without undue

6 hardship." *Heller*, 8 F.3d at 1438. "Whether an employer has met its statutory burden to

7 initiate a good faith effort to accommodate an employee's beliefs is a question of

8 fact." *Proctor*, 795 F.2d at 1477 (citing *Hardison*, 432 U.S. at 77); *EEOC v. Hacienda*

9 *Hotel*, 881 F.2d 1504, 1512 (9th Cir. 1989).

10    The City argues it already accommodated Plaintiff's religious needs through its

11 "generous time-off policy." (Doc. 37 at 10). Alternatively, the City asserts that any further

12 accommodations for Plaintiff were unfeasible or otherwise caused it undue hardship. (*Id.*)

13 Plaintiff argues the City cannot show as a matter of law that its scheduling system is a

14 reasonable religious accommodation. (Doc. 40 at 10–11). Plaintiff also undermines the

15 City's motives in initiating alternative accommodations and represents the City could have

16 granted him time off without facing undue hardship. The Court will first consider the

17 accommodations provided by the City's scheduling system before examining the City's

18 efforts to seek out alternative accommodations for Plaintiff.

19    / / /

20    / / /

21    **i.**    **The Accommodations Provided by the City's**
22         **Scheduling System**

23    If an employer "has already reasonably accommodated the employee's religious

24 needs, the statutory inquiry is at an end" and "the employer need not further show that each

25 of the employee's alternative accommodations would result in undue hardship." *Heller*, 8

26 F.3d at 1438. For example, an employer that provides its employees with a flexible

27 scheduling system[4] is one way it can sufficiently accommodate religious practices that may

28

---

[4] Flexible scheduling includes allowing for "flexible arrival and departure times; floating

conflict with an employee's work schedule.   29 C.F.R. § 1605.2(d)(1)(ii).   "The employment context requires balancing employer and employee interests, and that religious practice need not always be accommodated."   *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2448 n.13 (2022).

The City argues it has a "generous time-off policy" that already afforded Plaintiff 212 hours of time off during that year, and this is a reasonable religious accommodation under 29 C.F.R. § 1605.2(d)(1)(ii).  (Doc. 37 at 10).  The City relies on out of circuit cases,[5] primarily *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307 (4th Cir. 2008), to reason it did not have to provide Plaintiff additional unpaid leave time beyond that already provided to him by its policies.  (Doc. 37 at 10–12).  The City maintains that, under *Firestone*, its time-off policy is a "'significant accommodation' that 'could be structured in a way to permit most employees the opportunity to meet all of their religious observances.'"  (Doc. 36 at 13) (quoting 515 F.3d at 316).

The Court is not bound by the City's cited authorities, nor does it find *Firestone* controlling in the present matter.  The plaintiff in *Firestone* had requested scheduling accommodations so that he could observe 20 religious holidays and the weekly Sabbath (sundown on Friday to sundown on Saturday), and he did not utilize all accommodations provided by the employer's scheduling system, namely swapping shifts with employees. *Firestone,* 515 F.3d at 309, 311.  Plaintiff here is only asking for 1.5 days of voluntary unpaid leave, which is a drastic difference in frequency than the *Firestone* plaintiff. Moreover, unlike factual findings in *Firestone,* the City does not allege that Plaintiff failed to utilize all of the accommodations provided by its scheduling system.  *See id.* at 311; *cf. Hudson v. W. Airlines*, Inc., 851 F.2d 261, 266–267 (9th Cir. 1988) (finding that the plaintiff's "own failures to avail herself of reasonable means to eliminate the conflict

---

or optional holidays; flexible work breaks; use of lunch time in exchange for early departure; staggered work hours; and permitting an employee to make up time lost due to the observance of religious practices." 29 C.F.R. § 1605.2(d)(1)(ii).

[5] The City cites to *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 315–16 (4th Cir. 2008); *Philbrook v. Ansonia Bd. of Ed.*, 925 F.2d 47, 53–54 (2d Cir. 1991); *United States v. City of Albuquerque*, 545 F.2d 110, 113–14 (10th Cir. 1976)).

1  between her religious beliefs and her employment demands undercut her failure to

2  accommodate claim").

3      In sum, there is insufficient evidence to hold the City's scheduling system is a

4  reasonable accommodation under Title VII as a matter of law.  And "[t]he mere existence

5  of the City's [scheduling] system does not relieve it from the duty to attempt reasonable

6  accommodation of its employees' religious practices." *Balint*, 180 F.3d at 1056.  The Court

7  thus proceeds to consider whether the City initiated good faith efforts to accommodate

8  Plaintiff's request for time off but could not reasonably do so without facing undue

9  hardship.  *See Heller*, 8 F.3d at 1438.

10
11          **ii.    The City's Efforts to Provide Alternative
                     Accommodations**

12      Regarding the City's efforts to accommodate Plaintiff's beliefs beyond its

13  scheduling system, Plaintiff does not dispute that Ms. Basford considered alternate

14  solutions that might allow him to attend the Elders Training.  (Doc. 36-4 at 6).  However,

15  Plaintiff contends Ms. Basford did not know she had a duty to accommodate religious

16  requests, did not make a genuine attempt to accommodate him, and could have granted his

17  request for time off but chose not to.  (Docs. 40 at 4–6; 35 at 18–19).  Plaintiff also points

18  out that there are no City Rules that would prohibit his use of voluntary leave time as

19  requested.  (Doc. 35 at 7).  He further identifies additional solutions the City failed to

20  explore, such as having him "mak[e] up for his time off, us[e] the Citywide donation bank,

21  or [work] overtime."  (Doc. 40 at 5).

22      "Courts are reluctant to dismiss by summary judgment Title VII discrimination suits

23  where motive and intent are crucial elements[.]"  *Proctor*, 795 F.2d at 1477 (finding the

24  district court erred in granting summary judgment when issues of fact remain regarding the

25  employer's motive and efforts to accommodate an employee's religious beliefs).  Here,

26  whether to approve Plaintiff's request for unpaid time off was in Ms. Basford's sole

27  discretion.  (Doc. 35-3 at 53).  Plaintiff's objections to the City's motives are indeed

28  justified by Ms. Basford's deposition and emails.  In her deposition, Ms. Basford explained

1  she did not know she had to "look for reasonable and feasible accommodations" if a request
2  "for time off [] is for a religious function." (Doc. 36-5 at 24). She also wrote in an email:
3  "I would approve additional vacation, if someone had time. . . . If this is as important as
4  [Plaintiff] has portrayed, he should have planned for it." (Doc. 35-6 at 29).

5        Thus, the record places into issue the City's "motive" and "sincerity of its efforts"
6  to accommodate Plaintiff's request, which cannot be properly resolved on summary
7  judgment. *Proctor*, 795 F.2d at 1477.

8                        **iii.    The City's Potential Hardships**

9        Regarding the City's potential hardships when accommodating Plaintiff's request,
10 "[w]hat constitutes undue hardship must be determined within the particular factual context
11 of each case." *Balint*, 180 F.3d at 1054.  An employer may generally show hardship where
12 (1) an accommodation "results in . . . more than a de minimis cost to the employer, which
13 could include additional costs in the forms of lost efficiency or higher wages[;]" or (2) an
14 accommodation "would have more than a de minimis impact on other employees, such as
15 depriving the other employees of seniority rights or causing them to shoulder plaintiff's
16 share of the work." *Id.* (quoting *Opuku–Boateng v. California,* 95 F.3d 1461, 1468 n. 11
17 (9th Cir.1996) (internal quotations omitted).

18       The City characterizes Plaintiff's department as "very busy," and "short-staffed,"
19 with "time-sensitive" work, and so granting any time off puts additional strains on the
20 department. (Doc. 36 at 14).  The City claims it would have faced undue hardship if it
21 granted Plaintiff an accommodation specifically because five other employees had taken
22 time off the same week that Plaintiff requested leave. (Doc. 37 at 12).  It says it would have
23 been forced to either (1) deny another employee's right to their earned, accrued time off;
24 or (2) grant all employees' time off requests and be severely short-staffed. (Doc. 41 at 6).

25       To undermine the City's claim of staffing hardships, Plaintiff disputes the timing of
26 the other employees' requests for leave.  He claims that at the time of his request, the
27 employee calendar reflected that only one other employee had scheduled time off during
28 the week at issue. (Doc. 40 at 6).  Based on this version of the facts, Plaintiff reasons that

granting his request would not have resulted in any staffing hardship. (*Id.*)

The remaining question therefore is whether the City would been left short staffed *at the time* Plaintiff requested leave and denied Plaintiff's request to avoid hardship.  This timing is material because "[a] claim of undue hardship . . . must be supported by proof of *actual* imposition on coworkers or disruption of the work routine." *Townley*, 859 F.2d at 615 (emphasis added) (internal citations and quotations omitted).  Thus, the extent of the City's hardships is an issue of fact to be resolved at trial.  *See Proctor*, 795 F.2d at 1477 ("In ruling on a motion for summary judgment, it is not the function of the court to resolve existing factual issues through a 'trial by affidavits.'") (internal citations and quotations omitted).  Moreover, such factual disputes are also connected to the City's motive and sincerity when attempting to accommodate Plaintiff's request.

In sum, the Court finds that Plaintiff has pled a sufficient religious discrimination claim under a failure to accommodate theory.  Plaintiff has made a *prima facie* case showing he requested and was denied a religious accommodation.  Moreover, genuine disputes of material fact remain as to whether the City initiated good faith efforts to accommodate Plaintiff's request for time off but could not reasonably do so without facing undue hardship.  *See Balint*, 180 F.3d at 1056; *see also Banks v. At&T Mobility Servs.*, 2018 WL 11352471 (C.D. Cal. Dec. 18, 2018).  The Court therefore denies summary judgment to either party on Plaintiff's failure to accommodate theory due to disputes of material fact.  *See Balint*, 180 F.3d at 1056.

### 2.    Disparate Treatment on Account of Religion

As to Plaintiff's disparate treatment theory, "an individual suffers disparate treatment when he . . . is singled out and treated less favorably than others similarly situated on account of [religion.]" *Jauregui v. Glendale*, 852 F.2d 1128, 1134 (9th Cir. 1988) (internal quotations and alterations omitted).  The Court analyzes allegations of disparate treatment based on religion under a three-part framework.  *See Bodett*, 366 F.3d at 743 (applying the burden shifting framework set forth in *McDonnell Douglas*, 411 U.S. at 93).

First, an employee must establish a *prima facie* case of disparate treatment.  *Id.* Second, the burden shifts to the employer "to produce some evidence demonstrating a legitimate, nondiscriminatory reason for the employee's [adverse employment action]." *Id.*  Third, if the employer meets its burden of production, "any presumption that the [employer] discriminated 'drops from the case,' and the [employee] must then show that the [employer's] alleged reason for termination was merely a pretext for discrimination." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993)).

### i.    Plaintiff Does Not Argue a *Prima Facie* Case

The first part of the disparate treatment framework requires an employee to establish a *prima facie* showing: (1) he is a member of a protected class; (2) he performed his job duties in a satisfactory manner; (3) he experienced an adverse employment action; and (4) "similarly situated individuals outside [his] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Id.* (quoting  *Peterson*, 358 F.3d at 603).  The Court finds that Plaintiff cannot meet his burden to establish all four elements.

Plaintiff labels his second claim as "Disparate Treatment and Termination Based Upon Religion" and alleges the City "constructively discharged [him]" and treated him "differently than those who were not Jehovah's Witness." Doc. 1 at ¶ 51–52).  However, Plaintiff does not identify or argue any of the elements for *prima facie* case for a disparate treatment theory in his briefings.  Nor does he set forth any evidence in the ensuing summary judgment memoranda showing he intended to use this theory of religious discrimination.  *See Bodett*, 366 F.3d at 742 n.7.  The Court therefore treats this theory as waived and "need not engage in hypotheticals."  *Id.*

### ii.    The Record Does Not Support a *Prima Facie* Case

Even if Plaintiff had argued the elements, the evidence in the record still does not establish Plaintiff performed his job satisfactorily or show that the City acted with discriminatory intent, both of which are required to survive summary judgment.  *See Peterson*, 358 F.3d at 603.  Indeed, the City has provided documents that list issues in

- 16 -

Plaintiff's performance from May 1, 2029–January 13, 2020.  (Doc. 36-4 at 14, 17–18).  It also submitted to the Court email correspondence where the human-resources department decided to extend Plaintiff's Initial Regular Employment Probation and put him on a corrective action plan to "afford[] him the opportunity to correct the issues."  (Doc. 36-4 at 9).  Plaintiff does not dispute these employment reports, all of which undermine the satisfactory manner of his job performance.

Plaintiff has also failed to present any legitimate "comparator" evidence on his religious discrimination claim.  Although Plaintiff identifies instances where other employees were granted time off, he does so to argue the City would not have faced staffing hardships.  (Doc. 35 at 9).  Plaintiff "did not show through the comparators that any similarly situated individual outside [his] protected category was treated more favorably[.]"  *Bodett*, 366 F.3d at 744.

Plaintiff does not attempt to establish *prima facie* case for a religious discrimination claim under a disparate treatment theory, and the Court finds Plaintiff likely cannot based on the record.  The Court accordingly grants the City summary judgment in this respect.

## B.    Retaliation

Plaintiff's third Title VII claim is that the City retaliated against him after he requested a religious accommodation.   Title VII's anti-retaliation provision forbids employer actions that "discriminate against" an employee because he has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing" or "opposed" a practice that Title VII forbids.  *See* 42 U.S.C. § 2000e–3(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59–60 (2006); *see also Scott v. Mabus*, 618 F. App'x 897, 901 (9th Cir. 2015).

The Court's analysis of a retaliation claim involves a three-part framework.  *See Kerr v. Jewell*, 549 F. App'x 635, 638–639 (9th Cir. 2013) (applying the burden shifting framework set forth in *McDonnell Douglas*, 411 U.S. at 93).  First, the employee must show a *prima facie* case of retaliation.  *Id.*  "[Second], the burden of production shifts to the employer to present legitimate reasons for the adverse employment action. Once the

employer carries this burden, [the employee] must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Hosea v. Donley*, 584 F. App'x 608, 610–611 (9th Cir. 2014) (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.2000).

### 1.     Plaintiff Cannot Establish a *Prima Facie* Case

The first part of the retaliation framework requires an employee to establish a *prima facie* case showing: "(1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). Plaintiff argues the City retaliated against him as a matter of law because Ms. Basford relocated his workspace, put up a "Do Not Disturb" sign, and increased her scrutiny and criticism of his work, all of which took place after he requested a religious accommodation and filed an internal complaint for discrimination. (Doc. 39 at 7–8). The City asserts Plaintiff was not subject to any materially adverse employment action and even if he was, he fails to establish a causal link with any protective activity.   (Doc. 41 at 8–9).

### a.     Plaintiff's Protected Activity

Plaintiff has established he engaged in a protected activity under the first element. The City does not dispute that Plaintiff requesting an accommodation to attend his Elders Training is a protected activity under Title VII. *See* 42 U.S.C. § 2000e(j) (defining "religion" to "includ[e] all aspects of religious observance or practice." Plaintiff's filing of an internal complaint for religious discrimination is also a protective activity. *See Archuleta v. Corr. Corp. of Am.*, 829 F. App'x 242, 243 (9th Cir. 2020).

### b.     Adverse Employment Action

It is unlikely that Plaintiff can show he was subjected to an adverse employment action under the second element. "[R]etaliation claims may be brought against a much broader range of employer conduct than substantive claims of discrimination." *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1021 (9th Cir. 2018) (citing *Burlington*, 548 U.S. at 67–68). An adverse employment action for this purpose is one that is "reasonably likely

to deter employees from engaging in protected activity." *Ray*, 217 F.3d at 1243. Plaintiff accordingly must show "a reasonable employee would have found the challenged action materially adverse[.]" *Burlington*, 548 U.S. at 68 (internal quotations and citation omitted). Material adversity is important "to separate significant from trivial harms." *Id.* For example, "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*

Plaintiff asserts Ms. Basford retaliated against him by (1) increasing her scrutiny and criticism of him; and (2) increasing his workload; (3) moving his workplace to the call center, which he says is an undesirable workplace; and (4) putting up a "Do Not Disturb" sign at his cubicle. (Docs. 1 at ¶ 66; 35 at 6; 39 at 7–8). The City argues this conduct does not rise to the level of adverse employment actions as required by retaliation claims. (Docs. 36 at 16; 41 at 9). The Court will examine each action in turn.

First, scrutiny and "criticism . . . . are the types of trivial harms or minor annoyances that cannot support a claim of retaliation." *See Annenberg v. Clark Cnty. Sch. Dist.*, 818 F. App'x 674 (9th Cir. 2020) (finding an employer's criticism of an employee's lesson plans and classroom demeanor are not adverse employment actions). Second, the record shows Ms. Basford was negotiating with Plaintiff the number of tasks he could complete because Plaintiff only completed 6 tasks the previous day. (Doc. 36-4 at 7). This is not a materially adverse increase in workload. Third, Plaintiff cannot rely on his relocation as a materially adverse action because he admits in his deposition that all permit technicians work in the call center at some point on a rotating basis. (Doc. 36-2 at 124–125). The call center thus cannot be characterized as undesirable. Last, Ms. Basford's putting up a "Do Not Disturb" sign at Plaintiff's cubicle likely cannot constitute an adverse employment action. Ms. Basford testified that every employee had a sign to use, and it was "commonplace in [the] department." (Doc. 36-5 at 74). "When [she] need[s] somebody to focus on a task, [she would] ask them to put up their [] sign, so that they can remain productive and reduce traffic that interrupts their daily work." (Doc. 36-5 at 74). Accordingly, no reasonable employee in the department would find this act materially

adverse.

It is therefore unlikely that any of Plaintiff's examples constitute adverse employment action in the retaliation context.

### c. Causal Link

Under the third element, Plaintiff can show a causal link to his request for a religious accommodation but not to his internal complaint. A retaliation claim requires a "but-for" causal link to exist between the protected activity and the adverse action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). Such causal link may be established "by an inference derived from circumstantial evidence, such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Samuels v. UBS Fin. Servs., Inc.,* 2006 WL 1877258, at *2 (9th Cir. July 5, 2006) (citation omitted). However, if an employee "relies solely on the proximity in time inference to support the causation prong, that proximity in time must be 'very close.'" *Williams v. Tucson Unified Sch. Dist.*, 316 F. App'x 563, 564 (9th Cir. 2008) (quoting *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)) (citing cases finding a three, four, and ninth month periods are too long to support a causal link).

Here, Plaintiff does not offer any direct evidence to explain the motive behind Ms. Basford's conduct and relies solely on circumstantial evidence to infer causation. (Docs. 35 at 14; 39 at 7; 40 at 17). Plaintiff cannot establish a causal link with his internal complaint because it is undisputed that Ms. Bradford did not know he filed such a complaint while he was employed with the City. (Doc. 36-5 at 88). When an employer lacks knowledge of an employee's protected activity, this makes it impossible to establish the requisite but-for causation. *See Nassar*, 570 U.S. at 362.

However, Plaintiff can rely on the temporal proximity between his request for a religious accommodation and Ms. Bradford's conduct to infer causation. Plaintiff met with Ms. Bradford to request time off on February 10, 2020, while Ms. Bradford's alleged retaliation took place on February 25, 2020. Such actions occurred within fifteen (15) days

of each other, and this proximity is close enough to infer a causal link as a matter of law. *See Kerr*, 549 F. App'x at 639 (inferring a causal link when the proximity in time was less than a month).

Although Plaintiff has shown he engaged in protective activity by asking for a religious accommodation, Plaintiff has not sufficiently shown that the City subjected him to adverse action to support his retaliation claim. And even assuming *arguendo* that Plaintiff can make a *prima facie* case, his retaliation claim fails at the remaining steps of the three-step framework as discussed below.

### 2.    The City's Nonretaliatory Reasons

The second part of the retaliation framework requires an employer to present legitimate, non-retaliatory reasons for the adverse employment action. *See Hosea*, 584 F. App'x at 610–611. Ms. Basford testified she relocated Plaintiff closer to her desk so she could "monitor his productivity" because "[she] was concerned that he was not going to be productive during the final week of his employment." (Doc. 36-5 at 72–73). For example, she says Plaintiff had completed 6 tasks the day prior and completed 0 tasks that day. (Docs. 36 at 5; 36-5 at 72). Ms. Basford also explained her use of the "Do Not Disturb" sign was to help ensure Plaintiff's productivity. (Doc. 36-5 at 73). These are all neutral, non-retaliatory reasons.

The record further shows Plaintiff had exhibited deficiencies in his performance spanning from May 2019–January 2020 (Doc. 36-4 at 14–15), the human-resources department extended Plaintiff's Initial Regular Employment Probation (Doc. 35-4 at 12–14); and that Plaintiff was placed on a corrective action plan to help him correct the issues. (*Id.* at 13–14). Plaintiff's documented "history of inadequate performance" is sufficient to "provide adequate non-retaliatory reasons" for Ms. Basford's action. *Hobdy v. L.A. Unified Sch. Dist.*, 386 F. App'x 722, 714 (9th Cir. 2010); *see also Unt v. Aerospace Corp.*, 765 F.2d 1440, 1447 (9th Cir.1985) (concluding there was no Title VII violation when the adverse employment action resulted from the plaintiff's "well documented performance deficiencies").

Based on the record as a whole, the Court finds the City has sufficiently supplied neutral, non-retaliatory reasons for its actions.  *Id.*

### 3.        Plaintiff's Cannot Show Pretext

The final part of the retaliation framework requires Plaintiff to "demonstrate a genuine issue of material fact as to whether the reason advanced by [the City] was a pretext." *Hosea*, 584 F. App'x at 610–611.  Plaintiff may do so in two ways: (1) "directly by persuading the court that a [retaliatory] reason more likely motivated the employer" or (2) "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Campbell v. State Dep't of Educ.*, 892 F.3d 1005, 1022 (9th Cir. 2018) (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)). Plaintiff failed to identify any evidence under either means.

The Court first finds there is no genuine issue of material fact that Plaintiff's inadequate performance was documented before he engaged in protected activity.  Ms. Basford recommended to the human-resources department that he be terminated on February 3, 2020, based on his performance from May 2019–January 2020, while Plaintiff's protected activity took place on or about on or around February 10, 2020. *Compare* (Doc. 36-4 at 14–15) *with* (Docs. 1 ¶ 15; 36-4 at 5).  Plaintiff has therefore failed to rebut that the City's reasons for ensuring his productivity as pretextual. *See Hobdy*, 386 F. App'x at 714 (finding the plaintiff did not survive summary judgment when the record showed he had a documented history of poor performance before he engaged in protective activity).

Plaintiff also claims the City has a history of discriminating against him as an attempt to establish retaliatory motive.  (Doc. 35 at 2–3).  In doing so, Plaintiff cites two instances from March and May of 2019.  (*Id*.)  But such history is insufficient to show pretext because those actions occurred 9–11 months before Plaintiff engaged in protective activity on or around February 10, 2020.  (Docs. 1 ¶ 15; 36-4 at 5); *See Pineda v. Abbott Labs. Inc.*, 831 F. App'x 238, 242 (9th Cir. 2020) (finding employee cannot rely on a certain history to establish pretext because that history occurred prior to the protected

1    activity).

2        In sum, Plaintiff has not met his burden to establish a *prima facie* case for a

3    retaliation claim.  He fails to show he was subject to adverse employment actions after

4    requesting a religious accommodation.  Regardless, the City has met its burden in

5    supplying evidence of neutral, non-retaliatory reasons for its actions, namely Plaintiff's

6    history of inadequate performance and productivity.  Plaintiff has last failed to identify a

7    genuine issue of material fact regarding pretext.  The Court will therefore grant summary

8    judgment on Plaintiff's retaliation claim in the City's favor.

9    **IV.    Conclusion**

10       The Court denies summary judgment on Plaintiff's failure to accommodate claim,

11   but grants summary judgment in the City's favor on Plaintiff's disparate treatment and

12   retaliation claims.  First, Plaintiff has pled a sufficient religious discrimination claim under

13   a failure to accommodate theory.  Plaintiff has made a *prima facie* case showing he was

14   denied a religious accommodation, and there are genuine disputes of material fact

15   regarding the City's efforts to accommodate Plaintiff without facing undue hardship.  Such

16   factual disputes must be resolved at trial and so summary judgment on Plaintiff's first Title

17   VII claim is improper.  However, the record shows Plaintiff was not constructively

18   discharged as a matter of law.  Plaintiff therefore cannot rely on the constructive discharge

19   doctrine at trial to support his failure to accommodate claim.

20       Second, Plaintiff has not pled a sufficient religious discrimination claim under a

21   disparate treatment theory.  Plaintiff does not argue the elements for a *prima facie* disparate

22   treatment case in his briefings or set forth any evidence showing he intended to use this

23   theory of discrimination.  Neither does the record support a claim for disparate treatment.

24   The Court therefore finds Plaintiff has waived his disparate treatment theory and grants

25   summary judgment in the City's favor on Plaintiff's second Title VII claim.

26       Last, Plaintiff has not pled a sufficient *prima facie* case for a retaliation claim.  Nor

27   has he shown a genuine dispute of fact that the City's neutral, non-retaliatory reasons were

28   pretextual.  The Court therefore grants the City summary judgment on Plaintiff's third Title

VII claim.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant City of Mesa's Motion for Summary Judgment (Doc. 36) is **GRANTED in part and DENIED in part.**

**IT IS FURTHER ORDERED** that Plaintiff Aaron Smith's Motion for Summary Judgment (Doc. 35) is **DENIED**.

**IT IS FINALLY ORDERED** that in light of the denial of summary judgment  on Plaintiff's failure to accommodate claim under Title VII, the parties are directed to comply with Paragraph 10 of the Rule 16 Scheduling Order (Doc. 11 at 6) regarding notice of readiness for pretrial conference.  Upon a joint request, the parties may also seek a referral from the Court for a settlement conference before a Magistrate Judge.

Dated this 10th day of March, 2023.

Honorable Diane J. Humetewa
United States District Judge